IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FRANCIA M. GARTZKE,

        Plaintiff,

        v.

CAROLYN W. COLVIN,
Acting Commissioner of the Social Security,

        Defendant.

———————————————

Civ. No. 6:14-cv-00806-MC

OPINION AND ORDER

MCSHANE, Judge:

Plaintiff Francia M. Gartzke brings this action for judicial review of the Commissioner's decision denying her application for supplemental security income and disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

Gartzke, now 48 years old, alleges she became disabled on April 1, 2003[1] due to mental impairments. After a hearing, the administrative law judge (ALJ) determined Gartzke is not disabled. TR 28.[2] The ALJ erred in rejecting the opinion of Dr. Ryan Scott, the examining psychologist; and in rejecting the law witness testimony of Paula Rowe. The Commissioner's decision is REVERSED and this matter is remanded for calculation of benefits.

---

[1] Gartzke originally alleged she became disabled on October 1, 1999. At the hearing, Gartzke formally amended the alleged onset date to April 1, 2003 as she had substantial gainful activity before that date.

[2] "TR" refers to the Transcript of Social Security Administrative Record, ECF No. 9, provided by the Commissioner.

1 – OPINION AND ORDER

# BACKGROUND

Gartzke was sexually abused as a child. She claims to have too much anxiety to work, rendering her unable to stay on task more than 30 minutes without taking a break. After 30 minutes, she becomes very impatient with the task and feels like darting from the room and not returning.

Gartzke had a previous period of disability from September 1990 through January 2001, which she voluntarily ended in order to return to work. Gartzke then worked two years as a grocery store cashier. Gartzke explains she has anger management issues which cause her to be impatient and affect her mood. She fears people will fire her from a job or treat her badly. These fears led Gartzke to quit her job as a cashier in 2003. Gartzke also has work experience as a caregiver, and a list of odd jobs she performed for very short periods of time, such as raking leaves, walking dogs, and baking pies.

She is a high school graduate and attended college for two years before dropping out in 2008 because she could not pass a required math course. About five times a month, her anxiety caused her to leave school before the end of the day.

She uses public transportation but occasionally becomes disoriented upon exiting the bus. Gartzke generally does not like to be around people. When she sees her boyfriend, they go to one of their homes rather than to a public place. Gartzke suffers from flashbacks on a daily basis which take her anywhere from a few minutes to half an hour to recover from. She has terrifying nightmares and claims to be hypervigilant. Gartzke does not get along well with authority figures such as landlords and supervisors.

2 – OPINION AND ORDER

Gartzke lives alone in an apartment with her cat. She admits to hygiene problems caused by a failure to bathe or wash her clothes. She often has breakfast at a food kitchen run by a church, and then takes a bus to the library where she spends about two hours a day. Gartzke does her own shopping about three times a month, taking as long as two hours per trip. She watches television and browses the internet nearly every day. Gartzke also has contact nearly every day with Paula Rowe, her friend of twenty years.

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). To determine whether substantial evidence exists, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)).

## DISCUSSION

The Social Security Administration utilizes a five step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520 & 416.920 (2012). The initial burden of proof rests upon the claimant to meet the first four steps. If claimant satisfies his or her burden

3 – OPINION AND ORDER

with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner's burden is to demonstrate that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education, and work experience. *Id*.

At step two, the ALJ found Gartzke had severe impairments of mild degenerative disc disease, major depressive disorder, and post traumatic stress disorder ("PTSD"). TR 19. The ALJ found Gartzke had the RFC to peform medium work with the following limitations: she can understand, remember, and carry out simple, repetitive tasks on a constant basis; she can perform more complex tasks occasionally on an intermittent basis; and she can engage in no more than occasional, brief interactions with the public and coworkers. TR 21. A vocational expert testified that a person with the RFC as stated by the ALJ could work as a cleaner/housekeeper, hand-packager, and laundry sorter. Therefore, the ALJ determined plaintiff was not disabled under the Social Security Act. TR 28.

Gartzke argues the ALJ erred in rejecting the opinion of Dr. Scott, her examining psychologist, in finding Gartzke not credible, and in rejecting lay witness testimony. With respect to Dr. Scott's opinion and the lay witness testimony, I agree.

The record demonstrates Gartzke suffers from significant mental impairments. While Gartzke's physical impairments do not prevent her from working, the record points to the conclusion that as of her March 2, 2011 appointment with Dr. Scott, Gartzke's mental impairments prevented her from sustaining full-time employment.

The ALJ erred in elevating the opinions of the reviewing pyschologists above the opinion of the examining psychologist. Essentially, the reviewing psychologists attempted to interpret Dr. Scott's own notes and findings by formulating a mental RFC for Gartzke based on the

4 – OPINION AND ORDER

information available at that time. Several months later, Dr. Scott formulated a mental RFC for Gartzke. Dr. Scott's RFC, based on his own notes, findings, and recollections from his March 2011 examination of Gartzke, was more restrictive than the RFCs of the reviewing psychologists. As discussed below, the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Scott's RFC.

While the ALJ pointed to clear and convincing reasons, supported by the record, in finding Gartzke not fully credible, he erred in rejecting the law witness testimony of Ms. Rowe. This error, however, was harmless.

Crediting Dr. Scott's opinion as true, the record demonstrates that as of March 2, 2011, Gartzke was indeed disabled under the Act.

## Dr. Scott's Opinion

On March 2, 2011, Dr. Ryan Scott, a licensed psychologist, conducted a psychodiagnostic evaluation of Gartzke. TR 389. Dr. Scott diagnosed Gartzke with major depressive disorder, recurrent, moderate, and chronic PTSD. TR 393. Dr. Scott noted Gartzke appeared "to have symptoms consistent with posttraumatic stress disorder related to sexual abuse as a child." TR 392. During the evaluation, Dr. Scott was able to evaluate Gartzke's claims that she experienced a depressed mood most of the day nearly every day for at least the past decade TR 392, as well her claims of substantial issues with trusting others. TR 389-90. Dr. Scott listened to Gartzke's reports of "terrifying nightmares of cannibalism and sexual contact," TR 389, and her estimate of sleeping only one to three hours per night, TR 391.

The purpose of Dr. Scott's evaluation was to determine whether Gartzke suffered from PTSD and memory loss. TR 389. Despite clearly finding Gartzke credible on her claims of

PTSD, Dr. Scott noted Gartzke performed adequately on the memory tests and mental status testing. TR 391-92. Dr. Scott did not include any specific limitations in his 2011 evaluation.

In January 2013, Gartzke's attorney sent Dr. Scott his 2011 evaluation along with a Mental Residual Functional Capacity Report form to fill out. TR 655-59. Dr. Scott concluded Gartzke was "markedly limited" in several ways: maintaining attention and concentration for extended two-hour periods; working with or around others without being distracted; accepting and responding to instructions; and, perhaps most significant, "The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." TR 657-58. The form defined "markedly limited" as "A limitation which precludes the ability to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent work schedule." TR 656. Dr. Scott directed the reader to his March 2, 2011 evaluation of Gartzke. TR 659.

The limitations in Dr. Scott's January 2013 RFC are entirely consistent with Dr. Scott's earlier notes and findings that Gartzke:

> appeared to perseverate over the questions that were asked of her. At times she had to be redirected to focus on the current question without offering a lengthy explanation that was only tangentially related to the question that was asked of her. She appeared to be very nervous about her performance on the mental status testing and seemed to process information somewhat slower than [the] average claimant.
>
> * * * *
>
> Ms. Gartzke does appear to have symptoms consistent with posttraumatic stress disorder related to sexual abuse as a child. She reported that she regularly has nightmares and flashbacks. She also reported significant hypervigilance. It appears that this has caused problems in the past at work where she believes others have negative intentions toward her, perhaps without tangible evidence. She also indicated that in her relationship with her boyfriend she tends to be much

more standoffish and reported impaired ability to relate to him in a trusting manner.

Ms. Gartzke also appears to meet the criteria major depressive disorder, recurrent, moderate. She reported experiencing depressed mood most of the day nearly every day for at least the last decade. She also reported sleeping difficulties, loss of energy, fatigue, difficulty concentrating and lack of motivation. . . . This writer's impression of Ms. Gartzke is that she did seem to process information more slowly and was more deliberative than the average claimant.

TR 391-92.

Dr. Scott's RFC limitations were contradicted only by the opinions of the state reviewing doctors.[3] The reviewing psychologists concluded Gartzke had only moderate limitations and could consistently maintain concentration, persistence, and pace for simple tasks within normal two hour work periods. TR 136-40. As noted, the reviewing psychologists had Dr. Scott's notes and findings, but did not have the benefit of reviewing the RFC Dr. Scott assigned Gartzke. Thus, the ALJ had to resolve the conflicting medical opinions. Regarding Dr. Scott's opinion, the ALJ concluded:

With respect to Dr. Scott's MRFC forms, the undersigned notes the initial form was completed approximately 18 months after the one-time evaluation. The undersigned questions how accurately Dr. Scott remembered the one hour he spent with the claimant after so much time had passed, particularly when comparing the State agency opinion that resulted from a review immediately following the evaluation to the these MRFC forms. Dr. Scott did not provide any specific rationale for his MRFC findings, rather he directed the reader back to his evaluation; however, the findings on his evaluation did not seem supportive of the degree of limitation in his MRFC form. Dr. Scott had very limited access to the medical evidence of record. Moreover, a subsequent neuropsychological evaluation resulted in a finding that there was no underlying cognitive disorder, which clearly would have affected Dr. Scott's opinion. The medical evidence of record as a whole does not support that the claimant is incapable of sustaining simple work.

TR 26. None of the ALJ's reasons for rejecting Dr. Scott's opinion are legitimate.

---

[3] Dr. Scott and the reviewing psychologists were the only acceptable medical sources to formulate mental RFCs for Gartzke.

Where there exists conflicting medical evidence, the ALJ is charged with determining credibility and resolving any conflicts. *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. . . ." *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Generally, a treating doctor's opinion is entitled to more weight than an examining doctor's opinion, which in turn is entitled to more weight than a reviewing doctor's opinion. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

First, the ALJ questioned Dr. Scott's memory of his evaluation of Gartzke, which occurred more than 18 months before Dr. Scott formulated specific limitations. In other circumstances, this could be a legitimate reason for discounting an examining doctor's opinion. But in this instance, Gartke's attorney sent Dr. Scott his 2011 evaluation of Gartzke along with the mental RFC forms. Despite expressly acknowledging that Dr. Scott utilized his own evaluation in filling out the mental RFC forms, TR 24, the ALJ then "question[ed] how accurately Dr. Scott remembered the one hour he spent with the claimant after so much time had passed," TR 26. For some reason, the ALJ concluded that because Dr. Scott based his RFC−at least in the ALJ's opinion−solely on a review of his earlier examination notes and findings, this was a legitimate reason to assign greater weight to the opinions of the reviewing psychologists. The reviewing psychologists, however, never examined Gartzke, certainly did not remember her, and in fact based their opinions largely on their own interpretations of Dr. Scott's own 2011 notes and findings. Additionally, rather than assume Dr. Scott refreshed his memory with the supplied evaluation, the ALJ infers Dr. Scott merely grabbed his opinions out of thin air. While this assumption may hold some water if Dr. Scott's limitations differed greatly from his earlier

8 – OPINION AND ORDER

evaluation, Dr. Scott's mental RFC limitations in fact mirrored his notes and findings from his 2011 examination of Gartzke.

As described above, Dr. Scott's March 2011 notes and findings support his January 2013 RFC limitations. Further confirming that Dr. Scott in fact referred to his own evaluation of Gartzke in filling out the mental RFC form, Dr. Scott concluded Gartzke was not significantly limited in understanding and memory, even as to "detailed instructions." TR 657. Had Dr. Scott not actually refreshed his memory from his 2011 evaluation, one would not expect his memory-related RFC to align so precisely with his earlier findings that Gartzke performed adequately on the memory tests. In other words, Dr. Scott's opinion appears to be a neutral one. He certainly was not a mere advocate supporting Gartzke's claim or parroting her complaints.

While the reviewing psychologists had a bit more evidence (in the form of rather limited notes with therapists) to digest than Dr. Scott, they did not have the opinion of Dr. Thomas Boyd, another examining doctor. Dr. Thomas Boyd conducted a neuropsychological consultation of Gartzke on December 29, 2011, after the reviewing psychologists formed their mental RFCs. TR 581. Dr. Boyd observed Gartzke had a "mildly disorganized quality of speech, with occasional word finding hesitancy. Most notably, at times her thought process seemed slightly disjointed, with a childlike quality and some self-contradiction, as in her description of her relationship with her partner's grandchildren."[4] TR 583.

Gartzke scored largely within the mean, or slightly below it, in the testing administered by Dr. Boyd. TR 584-86. Dr. Boyd noted that throughout much of the testing, and especially in

---

[4] During her interview with Dr. Boyd, Gartzke first stated her partner's grandchildren "are like my kids," before stating that the couple does not often see the grandchildren and that they were not that close. TR 583.

9 – OPINION AND ORDER

the problem solving portions, Gartzke exhibited "much indecision and vacillation." TR 585. Dr.

Boyd commented on Gartzke's performance and self-reporting:

> Areas of particular concern include marked anxiety and tension, especially around
> personal relationships, consistent with self-report in interview. Anxiety is at such
> a level that the client may employ maladaptive patterns in attempting to ward off
> anxiety, such as phobic behavior, obsession-compulsion, and an unusual degree of
> concern around physical functioning and health matters. Depressive symptoms are
> also endorsed, and a number of findings suggest that a past traumatic experience
> continues to cause distress and anxiety. There are occasional odd responses and
> concerns around unusual beliefs (e.g., special talents), possible difficulty in
> interpreting social cues, a tendency toward volatile relationships, and a brittle self
> esteem.

TR 585.[5]

Dr. Boyd concluded "the single greatest likelihood is that Ms. Gartzke's symptoms are an

expression of very significant psychological influences. These likely include the turmoil, tension,

and anxiety related not only to significant ongoing psychosocial stressors, but also to unresolved

childhood sexual trauma dating to abuse within her home over a period of several years." TR

586. Dr. Boyd diagnosed PTSD and panic disorder. Dr. Boyd assigned Gartzke a Global

Assessment of Functioning ("GAF") score of 57, indicating moderate symptoms and/or moderate

difficulty in social functioning. TR 586.[6]

The ALJ concluded that had Dr. Scott known that subsequent neurological testing

showed Gartzke did not suffer from an underlying cognitive disorder, he would have formulated

a less restrictive RFC. TR 26. Dr. Boyd, however, clearly thought Gartzke suffered from "very

significant psychological influences." TR 586. Dr. Boyd formed his opinion despite noting

---

[5] Dr. Boyd and Dr. Scott were not the only ones to comment on Gartzke's "odd" responses to questions. During a
December 23, 2011 assessment, a social worker noted that Gartzke "had slightly erratic skipping to different
subjects, but appeared normal and engaged in the interview process." TR 507. In September 2012, another
therapist noted Gartzke's blunted affect and tangential speech. TR 561.
[6] Social Worker John Meyer, who treated Gartzke for several months, opined in December 2011 that Gartzke had a
GAF of 47, indicating serious symptoms and/or serious impairments in social or occupational functioning. TR 508.
In September 2012, another social worker assigned Gartzke a GAF of 53. TR 565.

Gartzke's "roughly average background cognitive abilities[.]" TR 586. Therefore, this reason relied on by the ALJ to reject Dr. Scott's RFC, like the other reasons, fails.

Everyone agrees Gartzke suffers from PTSD and major depressive disorder. Other than Dr. Scott and the reviewing psychologists, no other mental health expert offered an opinion as to Gartzke's specific mental limitations. There is a reason the regulations require that, all things being equal, examining doctors are entitled to more weight than reviewing doctors. This is especially true in cases turning solely on a claimant's mental impairments. Here, the reviewing psychologists based their RFCs largely on their interpretations of Dr. Scott's own evaluation notes and findings. But Dr. Scott formulated his own RFC, which happened to be more restrictive. And of those who formulated a mental RFC for Gartzke, Dr. Scott was the only one to sit down and look Gartzke in the eye during an in-person examination. Admittedly, this process if not perfect. But Dr. Scott's opinion as to Gartzke's mental limitations is the best evidence available. And here, the ALJ failed to provide specific and legitimate reasons for rejecting it.

> In the Ninth Circuit:
>
> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful. Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits. More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004); *see also Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).

11 – OPINION AND ORDER

The vocational expert testified that someone with the limitations noted in Dr. Scott's RFC would be unable to maintain full-time employment. TR 78, 80-81. The record, somewhat sparse as it is, has been fully developed. Other than Gartzke's own allegations, there is little evidence that her mental limitations advanced to the stage of preventing her from maintaining full-time employment before her March 2011 examination by Dr. Scott. She worked two full years after the date she originally claimed to be fully disabled. Just before her date last insured, Gartzke was a student for two years, coming within one class of obtaining an associate degree. And the few notes from therapy sessions do little to support Gartzke's claim of disability. In fact, absent Dr. Scott's 2013 mental RFC limitations, the reviewing psychologists' opinions are fully supported by the limited evidence in the record. But Dr. Scott formulated his own opinion as to Gartzke's limitations. He opined that as of March 2, 2011, Gartzke's mental limitations prevented her from maintaining full-time employment and that her condition would likely last longer than 12 months. TR 659.

Especially when dealing with mental impairments, the disability system is far from perfect. It can be difficult to establish a precise onset date. But Dr. Scott's opinion, which is the best opinion we have, indicates that Gartzke became disabled on March 2, 2011. Remand for calculation of benefits is therefore appropriate in this instance. Further proceedings would simply extend the time until Gartzke receives the supplemental security income she is entitled to. Remanding for further proceedings here, when Gartzke cannot demonstrate a disability onset date before September 30, 2008, her date last insured, would serve no useful purpose. This matter is therefore remanded for calculation of benefits.

12 – OPINION AND ORDER

**The ALJ's Adverse Credibility Determination**

In making an adverse credibility determination regarding Gartzke's subjective reporting on the severity of her symptoms, the ALJ was required to provide "specific, clear and convincing reasons" for rejecting Gartzke's testimony. *Vasquez v. Astrue*, 572, F.3d 586, 591 (9th Cir. 2009) (quoting *Smolen v. Charter*, 80 F.3d 1273, 1282 (9th Cir. 1996)). The ALJ provided several reasons for finding Gartzke not credible. Some were valid. Some were not.

For instance, the ALJ found Gartzke not credible because she asked her Laurel Hill counselors for assistance in seeking a job with requirements exceeding Gartzke's claimed limitations. TR 25. This is not a valid reason in finding Gartzke not credible. That Gartzke perhaps dreamed of reentering the workplace should be applauded, not used against her. Additionally, the regulations recognize claimants may attempt to engage in trial work periods without torpedoing their claims. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1038-39 (9th Cir. 2002) (noting that the administration "permits recipients of disability benefits to work on a trial basis without the trial work period adversely affecting their disability status.")). Here, Gartzke merely spoke with her counselors about finding work. She never even got to the trial work period stage.

The ALJ also found Gartzke "informed Dr. Scott that she had never been fired for reasons related to her mental health problems, but testified to the opposite." TR 25. The ALJ appears to base this finding on Gartzke's statement at the hearing that "I'm always paranoid that somebody's going to fire me or treat me bad. I was slapped by one of my bosses in the past so – and I was, I was let go for reasons that weren't right[.]" TR 66. This statement is not inconsistent with Gartzke's statement that she had never been fired for mental health related issues.

Other reasons provided by the ALJ are in fact legitimate and constitute clear and convincing evidence in finding Gartzke not fully credible as to the extent of her limitations. Especially in cases involving mental impairments, ALJs and courts must look to a claimant's own statements as to both their limitations, and the evolution of those limitations. Here, Gartzke clearly suffers from PTSD. The main issue is whether her symptoms prevent her from maintaining full-time employment. Clearly, at least in 2001 and 2002, Gartzke's symptoms did not prevent her from performing substantial gainful activities. During those years, Gartzke maintained employment as a grocery cashier. Despite being able to hold down this job, Gartzke originally alleged she became unable to work due to her disability as of October 1, 1999. TR 218. When a claimant alleges an onset date of 1999, yet maintains substantial gainful activities for over two years after that date, the ALJ may point to that discrepancy in finding a claimant not fully credible as to the extent of her limitations. Here, the ALJ did just that, noting that Gartzke continued to work after the alleged onset date.[7]

The ALJ also noted Gartzke often made allegations about her medical history and limitations that lacked support. TR 25. This is certainly true. On numerous occasions, Gartzke claimed to have suffered two heart attacks in 2010. However, an EKG showed normal results. TR 409.[8] Gartzke complained of blurry vision but had 20/20 vision. TR 405. Gartzke claimed to have gone 47 days without sleep. TR 409. Gartzke also claimed to have suffered a months-long concussion after hitting her head on a paper towel dispenser. Gartzke had trouble finding words and "even had trouble remembering her name." TR 419. Her primary care physician noted

---

[7] That Gartzke's attorney amended the onset date (to a date after she quit her cashier job) at the hearing does not alter this conclusion. The ALJ, and this court, must rely on Gartzke's own allegations in evaluating her claim. That she claimed becoming disabled in 1999 despite working for two full years after that date is a clear and convincing reason for finding Gartzke not credible as to her limitations.

[8] The EKG did show poor R wave progression, TR 409, but an echocardiogram was normal, TR 421.

Gartzke's "system presentation seems forced and overdone," with symptoms more appropriate with one suffering severe head trauma. TR 420. The ALJ's conclusion that, at least as regards to her self-reporting of her symptoms and limitations, Gartzke was not fully credible is supported by substantial evidence in the record.[9]

The ALJ also noted that despite claiming some difficulties in using public transportation, the record demonstrates Gartzke generally took the bus to the library every day without any problems. Although not a clear and convincing reason on its own, this reason is supported by the record.

An ALJ may look to an unexplained failure to seek or follow a prescribed course of treatment in determining a claimant's credibility. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Here, the ALJ noted that despite alleging debilitating symptoms from depression and PTSD, Gartzke does not take any medications for her complaints. Gartzke also went several years before seeking any counseling or treatment. Especially when dealing with claims of mental illness, these reasons on their own are likely insufficient to support an adverse credibility determination. But they are supported by the record, and they lend support to the ALJ's adverse credibility determination.

**Lay Testimony**

Gartzke contends the ALJ erred in failing to credit the lay testimony from her friend of 23 years, Paula Rowe. While I generally agree, any error is harmless.

---

[9] Although the ALJ properly found Gartzke not fully credible, her reports of a "long term concussion" and "pain when brushing her hair" surely factored into Dr. Scott's evaluation. TR 389-393. In other words, although Gartzke's self-reports may in fact be symptoms of her mental impairments (and therefore support her claim of disability), it does not demonstrate that she is credible regarding her self-reporting of limitations. In this case, the examining phsychologists, trained in evaluating and diagnosing claims of mental illness during in-person evaluations, are in fact the most reliable reporters on Gartzke's symptoms and limitations. This is especially true in a case like this, where Gartzke claimed to "like telling my cat to do his homework because I wanted a baby but don't have one so I turned my cat into a son I never had[.]" TR 390.

15 – OPINION AND ORDER

Rowe completed a Third-Party Function Report on December 26, 2010 in which she explains she has contact with Gartzke nearly every day. This daily contact included going for coffee together, cooking together at Rowe's house, or talking on the phone. Rowe states Gartzke has trouble taking direction, becomes overwhelmed and confused in the middle of tasks, suffers from poor memory and flashbacks, has hygiene problems, and becomes disorganized when trying to cook something other than a frozen meal. Rowe hired Gartzke to clean out her car for $20 but Gartzke was unable to finish the job. Gartzke keeps her house very clean and does not like clutter, so her house has minimal furnishings. She often panics and throws out things she buys for her home. According to Rowe, Gartzke is fearful people will stalk her, believes people pick on her and are out to get her, is consumed with conspiracy theories and tracking devices, and has trust issues. On the positive side, Rowe reports Gartzke takes the bus to a café and then to the library every day, where she stays for two hours. She spends a lot of time visiting her boyfriend, but is extremely jealous of him, and talks a lot on the phone with Rowe.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. *Molina*, 674 at 1114. The germane reasons must be specific. *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009). A legitimate reason to discount lay testimony is that it conflicts with medical evidence. *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). But the ALJ cannot discredit lay testimony because it is not supported by, or corroborated by, medical evidence in the record. *Bruce*, 557 F.3d at 1116.

The ALJ expressly gave weight to Rowe's concern about Gartzke becoming easily overwhelmed; he addressed this concern by limiting Rowe to simple, repetitive tasks. But the ALJ gave little weight to the rest of Rowe's statement for several reasons. First, the ALJ noted

16 – OPINION AND ORDER

the record contained nothing about an obsession with conspiracy theories. Gartzke correctly points out several references in the medical records to her reports of extreme suspiciousness, stalkers, and people plotting to get her fired at work. The term "conspiracy theory" is not a precise one and could be loosely interpreted to include Rowe's statements to her medical providers. Thus, this reason is not supported by the record.

Next, the ALJ reasoned that Rowe claimed Gartzke was disorganized but had a very clean home at all times. He considered these statements inconsistent with each other. Gartzke again correctly points out that Rowe limited the disorganization statement to the context of cooking. Lack of organized cooking skills is not inconsistent with keeping an obsessively clean house. The ALJ's reason is not persuasive.

Finally, the ALJ was concerned Rowe likely parroted Gartzke's allegations because she only meets her for coffee in the mornings and may not have an adequate picture of Gartzke's day-to-day functioning. Much of Rowe's statement discusses her observations of Gartzke's behavior, including her hygiene problems, her cooking disorganization, her housekeeping, and her inability to complete simple jobs for Rowe. Moreover, many lay witnesses have far less contact than the nearly daily contact Rowe had with Gartzke. This is not a germane reason to discount Rowe's testimony.

Although the ALJ erred in largely rejecting Rowe's statements, any error is harmless. Gartzke's statements to Dr. Scott generally mirrored Rowe's statements. Rowe wrote her statement only one month before Dr. Scott's examination of Gartzke. And as noted, Dr. Scott incorporated Gartzke's statements into the RFC he formulated, and that RFC is now credited as true. Additionally, Rowe did not include specific limitations not included in Dr. Scott's RFC.

17 – OPINION AND ORDER

Rather, Rowe's statements generally paint a picture of a person suffering from mental impairments. And on that point, all of the evidence in this record agrees.

## CONCLUSION

The ALJ erred in rejecting the RFC of Dr. Ryan Scott, and the law witness testimony of Paula Rowe. Credited as true, Dr. Scott's RFC establishes Gartzke is disabled as of March 2, 2011. The Commissioner's decision is REVERSED and this matter is remanded for calculation of benefits.

IT IS SO ORDERED.


DATED this 3rd day of September, 2015.


Michael J. McShane
Michael McShane
United States District Judge